## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

_____

)
**UNITED STATES OF AMERICA, ex rel.** )
**STANLEY L. WILLIAMS**, )
)
    **and** )
)
**STANLEY L. WILLIAMS**, )
)
       Plaintiffs, )
)
    **v.** )
)
**ABBOTT LABORATORIES**, )
)
       Defendant. )
_____)

Civil Action No._____

**EXEMPT FROM ECF**

**FILED UNDER SEAL**

**JURY TRIAL DEMANDED**

## COMPLAINT

This complaint alleges that Abbott Laboratories, acting through its Abbott Vascular Division (collectively, "Abbott" or "Defendant"), has been defrauding the United States through its federally funded health care programs. Among other things, Abbott has been requiring certain hospitals to purchase Abbott medical devices used in cardiac procedures in return for permitting those hospitals to participate in clinical trials involving other investigational Abbott cardiac devices. By engaging in this "pay to play" scheme and other misconduct, Abbott has violated the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, by knowingly been causing hospitals and other health care providers to submit false claims to federally-funded health care programs. Plaintiff Stanley L. Williams learned of Abbott's misconduct when he was an area sales director for Abbott. When he attempted to stop Abbott from engaging in the unlawful conduct, Abbott terminated his employment. Plaintiff, by the undersigned counsel, brings the *qui tam* claims in

this lawsuit on behalf of and in the name of the United States and for himself, and brings the whistleblower retaliation claim for himself, and alleges:

## JURISDICTION AND VENUE

1.      Counts I-III are civil actions by *qui tam* Plaintiff Stanley L. Williams, acting on behalf of and in the name of the United States, against Defendant Abbott Laboratories under the federal False Claims Act, 31 U.S.C. §§ 3729-3733. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1345, and 31 U.S.C. § 3732(a).

2.      Count IV is a civil action by Plaintiff Stanley L. Williams against Defendant Abbott Laboratories under the whistleblower retaliation provision of the federal False Claims Act, 31 U.S.C. § 3730(h).  This Court has jurisdiction pursuant to 28 U.S.C. § 1331, and 31 U.S.C. §§ 3730(h) and 3732(a).

3.       This Court has personal jurisdiction over Defendant pursuant to 31 U.S.C. § 3732(a), because Defendant transacts substantial business in this judicial district.

4.      Venue is proper in this judicial district pursuant to 31 U.S.C. § 3732(a), because Defendant transacts substantial business in this judicial district.

5.      None of the allegations set forth herein was based upon a public disclosure of allegations or transactions, as those terms are used in 31 U.S.C. § 3730(e)(4).

6.       To the extent any allegation set forth in this Complaint may have been based upon any public disclosures, Plaintiff would nonetheless be permitted to proceed with this lawsuit because he is an "original source," as that term has been defined in 31 U.S.C. § 3730(e)(4).

7.      Plaintiff discovered the fraudulent activities that are set forth in this Complaint through his employment with the Defendant.  Prior to filing this lawsuit, on June 10, 2011,

2

Plaintiff voluntarily provided his information about these fraudulent activities to the United States Attorney's Office for the District of Maryland.  Plaintiff believes that prior to his disclosures of this information to officials of the federal Government, the United States Government had no knowledge of the fraudulent activities that are the basis of this lawsuit.

## PARTIES AND OTHER RELATED PERSONS

8.      Plaintiff Stanley L. Williams ("Williams" or "Relator") is a resident of Fort Worth, Texas.  A trained pharmacist, Williams was employed by Abbott and its predecessor company, Guidant Corporation, for approximately 14 years.  From approximately July 2000 through September 2007, Williams was a sales manager for Guidant and then its successor, Abbott Vascular, in the coronary division.  From October 1, 2007 through March 31, 2010, Williams was an area sales director for Abbott Vascular in its endovascular division.  From April 1, 2010, until May 2, 2011, Williams was one of six area sales directors in Abbott Vascular's coronary division.  He led a sales force of about 30, including three managers and 27 sales representatives, responsible for sales in Texas, Oklahoma, Louisiana, New Mexico, Arizona, and Colorado, and parts of Montana, Wyoming, and Missouri.  On or about May 2, 2011, Abbott Vascular terminated Williams' employment.  Williams learned the matters set forth herein during the course of his employment with Abbott Vascular.

9.      Defendant Abbott Laboratories (hereinafter "Abbott") is a for-profit corporation with its headquarters in Abbott Park, Illinois.  Abbott Vascular, a division of Abbott with its headquarters in Santa Clara, California, manufactures devices used in cardiac procedures.  Abbott Vascular sells its products, directly or through distributors, to health care providers in the State of Maryland and nationally.

10.     The Center for Medicare and Medicaid Services ("CMS"), an agency within the United States Department of Health and Human Services ("DHHS"), has its headquarters at 7500 Security Boulevard, Baltimore, Maryland 21244-1850.  CMS is responsible for overseeing the federal Medicare program and the joint federal-state Medicaid program.

11.     The United States Department of Defense ("DOD"), an agency of the United States, is responsible for overseeing the TRICARE program, a federally funded medical insurance program for military personnel and their families.

12.     The United States Food and Drug Administration ("FDA"), an agency within DHHS, has its headquarters at 10903 New Hampshire Avenue, Silver Spring, Maryland 20993. FDA is responsible for approving and overseeing the use and sale of certain medical devices, including devices used in coronary procedures, in the United States.

## LEGAL STANDARDS GOVERNING FEDERAL HEALTH CARE PROGRAMS

13.     Medicare is a federally funded health insurance program primarily for the elderly. Medicare was created in 1965 in Title XVIII of the Social Security Act. Medicare has several parts, including:  Part A, the Basic Plan of Hospital Insurance, which covers the cost of hospital services and related ancillary services; and Part B, which covers the cost of physicians' services and other ancillary services not covered by Part A.

14.     Medicaid is a state and federal assistance program to provide payments of medical expenses for low-income patients.  Medicaid also was created in 1965 in Title XIX of the Social Security Act.  Funding for Medicaid is shared between the Federal Government and those states participating in the program.

15.     TRICARE is a federally funded medical insurance program for military personnel, their spouses and unmarried dependent children under the age of 22, administered by

4

TRICARE Management Activity pursuant to 10 U.S.C. §§ 1071-1107.  TRICARE was

established by Title 10, U.S.C. Chapter 55 (formerly known as CHAMPUS), and operates in

accordance with policies and procedures set forth in Department of Defense TRICARE

regulation 6010.8-R, 32 C.F.R. Part 199.

16.     When Medicare, Medicaid, or TRICARE covers a patient, the applicable program

reimburses hospitals and physicians separately for surgeries performed in the hospital inpatient

setting.  Hospitals and physicians submit separate claims for their respective services.

**The Anti-Kickback Statute**

17.     The Anti-Kickback Statute ("AKS"), codified at 42 U.S.C.A. § 1320a-7b, was

initially enacted in 1972 to address congressional concern that payoffs to those who can

influence decisions about the purchase and delivery of health care goods and services will result

in goods and services being provided that are medically unnecessary, of poor quality, or even

harmful to a vulnerable patient population.  The AKS was designed to ensure that medical

decisions, including the decision as to what medical devices should be purchased, would be

based on the provider's professional judgment as to how to best serve patients, rather than the

provider's personal financial interests.  The AKS has been amended to strengthen its protections

against kickbacks masquerading as legitimate transactions.

18.     The AKS prohibits the solicitation, receipt, offer, or payment of remuneration in

return for purchasing or recommending the purchase of any good, facility, service, or item for

which payment will be made in whole or in part under a Federal health care program.  *See* 42

U.S.C.A. § 1320a-7b(b).  "Federal health care program" is defined to include any plan or

program that provides health benefits funded directly, in whole or in part, by the United States

Government.  *See* 42 U.S.C.A. § 1320a-7b(f).  This definition includes the Medicare, Medicaid, and TRICARE programs.

19.     Federal regulations, codified at 42 C.F.R. 1001.952(d), identify certain narrowly defined financial transactions known as "safe harbors" that do not come within the prohibitions of the AKS.  Persons or entities relying on the safe harbor exceptions to avoid liability under the AKS have the burden of affirmatively proving their strict compliance with all conditions set forth in the statutory exceptions.  None of the "safe harbors" cover the violations of the Anti-Kickback Statute described in this Complaint.

### Compliance with the AKS is a Condition of Payment by the Government

20.     "[A] claim that includes items or services resulting from a violation" of the AKS "constitutes a false or fraudulent claim for purposes of [the civil False Claims Act]."  42 U.S.C. § 1320a-7b (g).

21.     Compliance with the Anti-Kickback Statute is a necessary condition to the right of all health care providers, including physicians and hospitals, to receive or retain payments from the Medicare, Medicaid, or TRICARE programs.  For example, in order for physicians to participate as Medicare providers, they must complete a Provider/Supplier Enrollment Application that includes a Certification Statement that contains "Additional Requirements for Medicare Enrollment."  Item 4 states:  "I agree to abide by the Medicare laws, regulations and program instructions that apply to me.  The Medicare laws, regulations, and program instructions are available through the Medicare contractor.  *I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law),* and on my compliance with all applicable conditions of

participation in Medicare."  (U.S. Dep't of Health & Human Services, Ctrs. for Medicare &

Medicaid Services, CMS 855I, Medicare Federal Health Care Provider/Supplier Enrollment

Application.)  Therefore, a physician who is not in compliance with the Anti-Kickback Statute is

not eligible to receive payment from the Medicare program.

22.     Similarly, in order to participate in various federal-state Medicaid programs,

providers, including physicians and hospitals, must complete contracts of participation.  In these

contracts, providers must agree to conform to all Medicaid requirements covered in Federal or

State laws, regulations or manuals.  The AKS is a federal law that expressly applies to Medicaid.

A provider must complete a contract to participate in the Medicaid program as a condition of

receiving payment.  Therefore, a provider that is in violation of the AKS is not eligible to receive

payment from the Medicaid program.

23.     The TRICARE program is governed by regulations set forth at 32 CFR § 199 *et

seq*.  Section 199.9(c) describes conduct that would be considered "fraud" against the TRICARE

(formerly "CHAMPUS") program, stating in relevant part: "(12) Arrangements by providers

with employees, independent contractors, suppliers, or others which appear to be designed

primarily to overcharge the CHAMPUS through various means (such as commissions, fee-

splitting, and kickbacks) used to divert or conceal improper or unnecessary costs or profits."  The

TRICARE program considers compliance with the Anti-Kickback Statute as a condition of

payment.

24.     As a prerequisite to receiving Medicare payments, a hospital must annually

submit a cost report certifying its compliance with the laws and regulations regarding the

provision of health care services.  The certification page specifically provides that "if services

identified in this report were provided or procured through the payment directly or indirectly of a

7

kickback or were otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result." The certification further provides: "*I further certify that I am familiar with the laws and regulations regarding the provision of health care services and that the services identified in this cost report were provided in compliance with such laws and regulations.*" (U.S. Dep't of HHS, Ctrs. for Medicare & Medicaid Services, CMS 2552-96, Hospital and Hospital Care Complex Cost Report (emphasis added).) In other words, as a necessary condition for receiving Medicare funds, a hospital must expressly certify that the services identified in its cost report were, *in fact*, provided in compliance with laws that include the AKS. The Medicare program would not pay a hospital's claims for services provided in violation of the AKS.

25.  Federal law and regulations require that any health care provider who furnishes health care services that may be reimbursed under Medicare, Medicaid, or TRICARE must ensure that, to the extent of his or her authority, those services are provided "only when, and to the extent, medically necessary." (42 U.S.C.A. § 1320c-5(a); 42 C.F.R. § 1004.10.) This requirement makes the health care provider the "gatekeeper" who, through the exercise of his unbiased medical judgment, plays a critical role in determining what services will be reimbursed with federal funds. If the gatekeeper's medical judgment is corrupted – for example, by the receipt of kickbacks from a party who would benefit from the gatekeeper's decision to purchase and use that party's products in the course of patient care – then the federal health insurance system is at risk of paying for services that were not really medically necessary. The AKS was enacted to address this risk.

## THE USE AND BILLING OF CARDIAC DEVICES

26.     Costs associated with cardiac procedures utilizing medical devices are separately billed to payers, including Medicare, Medicaid, and TRICARE, by the surgeon and the hospital. The surgeon performing the surgical procedure bills for his or her professional services on a Form CMS-1500, identifying the surgical procedure by a code known as a CPT (Current Procedural Terminology) code.  Hospitals bill payers, including Medicare, Medicaid, and TRICARE, for their costs related to the surgery and associated hospital admission, including the medical devices utilized, on a Form CMS-1450 (formerly UB-92).  The hospital completes the CMS-1450 with information that describes the services provided and the patient's diagnoses, as well as other required information.

27.     Although the devices utilized in cardiac procedures are generally purchased by the hospital, it is nearly always the surgeon who chooses which manufacturer's product to use in a specific surgery.  Consequently the surgeon's product selections play a large role in determining the hospital's purchasing practices.  The devices used in cardiac procedures include, among other things, stents.

28.     The costs that a hospital incurs for the purchase of devices used in connection with cardiac procedures performed on patients covered by Medicare, Medicaid, or TRICARE are passed on to those programs through the hospital's billings on CMS-1450 forms.  These costs are also included in the annual cost report that the hospital submits to Medicare as the hospital's final claim for payment for the year.

## ABBOTT VASCULAR'S PRODUCTS AND CLINICAL INVESTIGATIONS

29.     Abbott Vascular's coronary division generates most of its profits from the sales of a drug-eluting stent ("DES") called "Xience."  This stent was originally developed by Guidant

Corporation, but in April 2006, Boston Scientific Corporation purchased most of the assets of Guidant for approximately $27 billion.  As part of the same deal, Abbott purchased Guidant's vascular intervention business, in the process acquiring Guidant's drug eluting stent.  However, Abbott agreed to license the DES to Boston Scientific, allowing Boston Scientific to market the same stent under the name "Promus."  The packaging for Promus indicates that it is manufactured for Boston Scientific by Abbott Vascular.  Aside from the packaging, Promus is the same stent as Xience.  FDA approved the drug-eluting stents (Xience and Promus) for sale in the United States in July 2008.

30.     In a profit-sharing arrangement, each time Boston Scientific sells a Promus stent, it must pay Abbott Vascular an up-front acquisition cost plus a royalty of 40% of the proceeds of the sale.  Despite this arrangement, Boston Scientific and Abbott Vascular compete to sell their respective versions of the stent to the doctors and hospitals that implant the stent in patients, with Boston Scientific generally pricing the stent at or below the Abbott Vascular price.  Because the two companies are selling exactly the same product, and because Boston Scientific offers a comparable or lower price while, at the same time, offering a more diverse portfolio of coronary products, it has been very difficult for Abbott Vascular to gain additional market share from Boston Scientific for sales of the stent.

31.     Abbott Vascular has three devices that are currently undergoing clinical trials before they are approved for use in the United States:  the Xience Prime stent, which is subject to a clinical trial called "EXCEL"; the Bioresorbable Vascular Scaffold ("BVS") device; and the MitraClip system.

A.    EXCEL

32.    "EXCEL" stands for the evaluation [E] of Xience [X] Prime vs. coronary [C] artery bypass surgery for effectiveness [E] of left [L] main revascularization.  The "left main" artery is the coronary artery that supplies much of the blood to the heart.  Because of its critical function, and the fact that a blockage of the artery is often fatal, it is known as the "widowmaker."  The EXCEL study is supposed to evaluate the outcomes in patients with left main artery disease who are treated with the Xience Prime drug-eluting stent vs. patients who are treated with bypass surgery.

33.    The EXCEL trial is being led by the Cardiovascular Research Foundation, with Abbott contributing approximately $40 million of funding.  In early 2010, approximately 250 to 300 hospitals applied to participate in the trial, from which 50 United States sites were to be chosen.  The chance to participate in this study is a very valuable commercial opportunity for these hospitals.  Participating in the study gives the hospitals a head-start over their competitors by providing them with a year or two of experience in using a new, cutting-edge technology.  Then, assuming the device is ultimately approved, these hospitals will have already developed the expertise in implanting the stent, which they can advertise in order to attract patients who may benefit from the procedure.

B.    Bioresorbable Vascular Scaffold (BVS)

34.    The bioresorbable vascular scaffold, or "BVS," is a device designed for the treatment of coronary heart disease.  The device restores blood flow by opening a clogged blood vessel and providing support to the vessel until the device completely dissolves into the body within two years.  This device allows the vessel to move, flex, and pulsate, and it is supposed to

be a marked improvement over permanent metallic implants, reducing the risk of blood clots. Abbott hopes to commercialize the device under the brand name ABSORB.

35.     The European Union has already approved the device for sale.  Abbott Vascular has also been conducting a global clinical trial for BVS and tried to persuade FDA to allow the inclusion of as many as five U.S. sites in this trial.  FDA ultimately decided <u>not</u> to allow BVS to be tested at U.S. sites.

C.     <u>MitraClip</u>

36.     Mitral Valve Prolapse is a common heart condition that allows blood to leak between the chambers of the heart because of a defect in the mitral valve.  The MitraClip system is designed to treat patients with this condition without requiring open heart surgery.  Similar to balloons that are inserted in patients who are at risk of heart attacks, MitraClip involves the insertion of an implant with a less-invasive, catheter based procedure.  The MitraClip system includes three major subsystems:  the steerable guide catheter, the clip delivery system, and the implant itself.

37.     MitraClip has been being studied in the U.S. under the EVEREST II randomized trials.  ("EVEREST" stands for Endovascular Valve Edge-to-Edge Repair Study.)  Patients in the trial undergo 30-day, 6-month, and 12-month clinical follow-ups, and then are re-checked annually for up to 5 years after the procedure.  At present, the study's results appear promising. However, MitraClip is currently under recall by Abbott because of a defect in the delivery catheter.  In several patients, a ring in the delivery device, used to make the catheter visible to imaging equipment, has fallen off when doctors have tried to remove the catheter.  There has been one death associated with this defect.  The MitraClip implant itself has no known defects, and patients who have had the device successfully implanted are not affected by the recall.

12

## THE FRAUDULENT CONDUCT

38.     The Abbott Vascular Division has created and pursued a marketing scheme knowing that, if it was successful, it would result in the submission by hospitals and physicians of false claims to federal health insurance programs, as well as the submission of false certifications required by those programs as a condition of payment.  Abbott has been aware that the hospitals and physicians could not maintain their eligibility to be providers for Medicare, Medicaid, and TRICARE without certifying their compliance with federal health laws, including the Anti-Kickback Statute.  Abbott's conduct, at a minimum, has been a substantial factor in bringing about the submission of false claims and certifications by hospitals and physicians throughout the United States.

39.     First, Abbott Vascular has been requiring certain hospitals and the doctors who influence the hospitals' purchasing decisions to purchase Abbott Vascular cardiac devices in return for being considered for participation in clinical trials of other experimental products, or as a condition for becoming a prioritized commercial site for products that have been approved for sale.  By offering hospitals these clinical and/or commercial opportunities in exchange for their agreement to purchase Abbott products, Abbott Vascular knowingly and purposefully is offering an inducement to these hospitals to purchase other Abbott products—primarily, its drug-eluting stents—for use in procedures on Medicare, Medicaid, and TRICARE beneficiaries, which violates the AKS.  The claims submitted by these hospitals for procedures performed on these beneficiaries, as well as the claims submitted by doctors for professional services rendered on behalf of these beneficiaries, are false claims, because the Government would not pay these claims if it was aware that the underlying transactions involved the payment of kickbacks.

40.     Second, Abbott Vascular has been offering direct financial and other remuneration to hospitals in exchange for those entities' purchasing Abbott Vascular's products. Abbott Vascular funded an expensive cardiovascular conference at a hospital in Louisiana and, in return, that hospital ramped up its purchases from Abbott.  Abbott Vascular has also met with employees at other hospitals and offered to assist those hospitals with their marketing if they step up their purchases of Abbott products.  Through this conduct, Abbott has been violating the Anti-Kickback Statute and knowingly causing hospitals and physicians to submit false claims.

41.     Finally, Abbott Vascular has attempted to increase its sales to various physicians and hospitals by offering large amounts of free product and inducing the physicians and hospitals to illegally bill Medicare, Medicaid, and TRICARE for the "samples."

A.      The "Pay-to-Play" Scheme for Clinical Trials and Commercial Sites.

42.     When choosing a hospital to participate in a clinical trial, a company such as Abbott is supposed to base its decision solely on clinical criteria, *i.e.*, on which hospitals are best qualified from a clinical standpoint.  When selecting hospitals for participation in the trial, it is inappropriate for the company to take into consideration the impact a hospital's selection would have on sales of other company products.  To guard against this impropriety, Abbott purports to maintain a "firewall" between its sales force and its clinical staff.  Contrary to its purported firewall policy, however, Abbott Vascular's top managers have conditioned hospitals' participation in clinical trials on whether they have been purchasing, or will agree to purchase in the future, a significant volume of Abbott Vascular products, primarily the Xience stent.

43.     For the EXCEL clinical trial, Abbott Vascular's top sales managers asked the sales force to rank the various hospitals that were interested in participating in the trial -- not in terms of any criteria relevant to their clinical qualifications, but instead, in terms of their value as

14

"partners," *i.e.*, as customers who are purchasing a sufficient amount of Xience and other Abbott Vascular products.  Moreover, Abbott Vascular's top sales managers made it clear to hospitals that, if they wanted to be considered for the trial, they would have to purchase significant volumes of Abbott Vascular Products.  In other words, the hospitals knew they had to pay to play.

44.    Hospitals that wished to participate in the EXCEL trial were supposed to complete and submit survey forms to Abbott Vascular by March 1, 2010.  Shortly after the deadline, on March 3, 2010, Jamie A. Gile, an Abbott Vascular employee, sent an e-mail to the top sales leadership of Abbott Vascular.  Attached to the e-mail was a spreadsheet on which each row corresponded to an applicant for the trial.  Most of the columns set forth various identifying information for the applicants.  The spreadsheet also contained two columns, columns "O" and "P," under which the senior sales leadership was supposed to provide additional information. These columns were titled:  "Partnership Assessment" and "Additional Comments by Sr. Sales Leadership."

45.    Gile noted that he was attaching "the list of accounts that submitted a survey for EXCEL consideration."  Then, under "Action Items," the e-mail requested that the sales leadership do the following:

●  Complete the Partnership Assessment column 'O' by selecting one of the

options 1) Highly Recommend 2) Recommend 3) Do Not Recommend or blank.

●  Add additional comments in column "P" especially if you are not

recommending a site for partnership, it's important to specify why.

The purpose of Gile's e-mail was to solicit the views of the sales force as to which "accounts," *i.e.*, hospitals, should be selected by Abbott Vascular to participate in the EXCEL clinical trial.

46.     In March 2010, Williams was in the process of transitioning from a position in the endovascular division to another position in the coronary division.  On March 8, 2010, he received an e-mail from his supervisor with the subject heading "Change of direction."  In the e-mail, the supervisor wrote:  "I've been told NOT to document in the EXCEL spreadsheet why we do not recommend a specific site.  We will just talk verbally about it in the morning."  This e-mail reflected the understanding by Abbott Vascular's top sales managers—who conveyed their understanding to Williams' supervisor—that it was improper to have the sales force recommending approval or disapproval of specific clinical trial sites based on sales considerations.  Management still demanded input from the sales force based on sales considerations; they just did not want the sales force to put such recommendations *in writing*.

47.     On April 1, 2010, Williams became a sales director of Abbott Vascular's coronary division with responsibility for the southwest area.  In May 2010, Sam Conaway, who was a divisional vice president and Dick Cassidy's direct supervisor, asked Williams for information about accounts in his region where Abbott might be able to "flip business" to Abbott products if Abbott were to award clinical trials to such sites.  In an e-mail dated May 12, 2010, Williams provided Conaway with a list of three "target accounts" in each of three geographic areas—north Texas, south Texas, and Phoenix, Arizona—where Williams saw potential for increasing Abbott sales if the accounts were chosen as sites for clinical trials.  For each of these accounts, Williams provided the name of the key interventional cardiologist.  Several months later, on August 25, 2010, in response to a similar request from Conaway, Williams sent another e-mail with a list of target accounts in Oklahoma and Arizona.  Conaway orally instructed Williams *not* to put anything referring to clinical trials in his e-mails.

48.     Conaway was also making similar inquiries of the sales directors responsible for other geographic areas.  When sales were not going well in any particular region, Conaway would pose the question, "What can we do to flip the business?  If we got them a clinical trial, do you think we could flip the business?"

49.     In July 2010, the Abbott Vascular group travelled to Louisiana to attend the New Cardiovascular Horizons Conference, hosted by Terrebonne General Medical Center of Houma, Louisiana.   Abbott Vascular was targeting Terrebonne for increased sales of its products. During a meeting in a coffee shop at the Roosevelt Hotel in New Orleans, Louisiana, Chip Hance -- the president of Abbott Vascular -- suggested considering Terrebonne as a potential U.S. site for a BVS global trial as a way of increasing sales.

50.     In or about September 2010, Dick Cassidy was promoted from area director to divisional vice president for the west (with responsibility for both coronary and endovascular). Cassidy became Williams' supervisor and was one of three employees who reported to Sam Conaway, divisional vice president for the entire country (also covering coronary and endovascular).

51.     In his first phone call with Williams after becoming his supervisor, Cassidy asked Williams whether there were any "accounts" (*i.e.*, hospitals) that could be "flipped" if they were selected for any clinical trials, including the EXCEL and BVS trials.  Cassidy also asked Williams to recommend a hospital where, by including the hospital in the BVS trial, Abbott Vascular might induce the hospital to increase its purchases of other Abbott Vascular products. A few days later, in their first face-to-face meeting after Cassidy's promotion, Cassidy asked Williams the same thing about the BVS trial and any accounts where the trial could to be used to

induce more business.  During the phone conversation and meeting, Cassidy specifically admonished Williams not to put anything in writing about Cassidy's requests.

52.    While asking Williams for his recommendation, Cassidy told Williams that there was "no guarantee" that a site that he recommended would ultimately be one of the few sites chosen for the BVS trial.  Cassidy said he would also be soliciting a recommendation from Jane Gaitley, who was the area director for the west coast region, and that the other divisional vice presidents (*i.e.*, Cassidy's peers) would be doing the same within their respective geographic sales areas.  Cassidy said that his goal was to choose the sites with the best potential for flipping business as the participants in the BVS trial.

53.    During September 2010, the first month that Williams was working under Cassidy, Williams went out to dinner with Dr. James Choi, an interventional cardiologists with significant influence over cardiac product purchasing decisions by Baylor Heart and Vascular Hospital in Dallas, Texas.  At the dinner, they discussed Abbott Vascular's EXCEL trial.  Choi stated: "Sam [Conaway] got me that trial.  I took care of you guys, and Sam got me that trial."  Williams asked him what he meant, and Choi said that "we got you guys back on the shelf, and Sam took care of me and got me that trial."  Within days after that dinner, Williams was meeting with Conaway and told him that "James Choi says hello."  Conaway responded, "I took care of James, got him in that trial."  In a separate discussion, Dick Cassidy made similar comments about getting James Choi into the trial.

54.    Williams understood that, for clinical reasons, Baylor Heart and Vascular Hospital in Dallas, along with St. Luke's Episcopal Hospital in Houston, Texas, had *not* been considered good candidates for participating in the EXCEL trial.  Williams understood that they both had unusually high morbidity and mortality rates in connection with bypass surgeries.

Williams concluded that sales people within Abbott Vascular must have had to exert influence over the clinical research group in order to get these two sites included in the EXCEL study.

55.     Consistent with the statements by Choi and Conaway, Baylor Heart and Vascular Hospital significantly increased the level of its purchases of Abbott Vascular devices around the time it was selected for the EXCEL trial.  Prior to that timeframe, Baylor was barely purchasing any Xience stents—less than $200,000 of the product per year.  Since that time, however, Baylor has increased its purchases of Xience stents to approximately $600,000 to $1 million annually. Another hospital that was chosen as a clinical site—Baylor Heart Hospital in Plano, Texas—has also dramatically increased its purchases of Abbott Vascular's coronary products, going from virtually nothing to more than $750,000 worth per year.

56.     Abbott Vascular has also been linking purchase levels to the consideration of hospitals as potential commercial sites for a third Abbott product, the MitraClip system. MitraClip is a new device for which Abbott has had good results in clinical trials.  Hundreds of hospitals across the United States have expressed interested in this technology.  Abbott is doing a limited roll-out, however, because the procedure requires a great deal of expertise and hospital resources.  Abbott expects that in the first two years after MitraClip is approved, Abbott will select approximately 50 sites to perform the procedure.  Abbott has been leveraging the limited roll-out of MitraClip to induce hospitals to increase their purchases of other Abbott products.  In essence, Abbott has been telling the hospitals that they cannot be guaranteed to get this technology, but if they do not increase their "partnership" with Abbott, they will *not* be getting it. In other words, Abbott's "partners" will be considered first.  When Abbott refers to "partnering," it is talking about hospitals increasing their purchases of Abbott products.  Among the hospitals

Abbott has been considering for the MitraClip roll-out are Terrebonne General Medical Center of Houma, Louisiana, and the Banner Health System of Phoenix, Arizona.

57.     Abbott Vascular has been considering Baylor Heart and Vascular Hospital in Dallas, Texas, as a site for BVS and MitraClip (in addition to EXCEL, for which it has already been selected ), despite that hospital's clinical problems.  In addition, Abbott has been considering selecting Baylor Heart Hospital in Plano, Texas, as a clinical trial site.  During the years 2008-2010, Baylor Heart Hospital in Plano did not purchase a significant amount of Abbott Vascular coronary products, but that hospital has recently begun to increase purchases of Abbott peripheral products.

58.     Abbott Vascular has also worked on persuading several other hospitals in the Southwest to "partner," *i.e.*, buy more Abbott Vascular products, in return for being considered for clinical trials or commercial roll-outs.  Those hospitals include St. Luke's Episcopal in Houston, Texas; Methodist Hospital in Houston, Texas; and Memorial Hermann Hospital. Williams understands that Abbott Vascular has not been successful in its approaches to St. Luke's Episcopal.  However, Abbott Vascular has succeeded in increasing its sales of drug-eluting stents to Methodist Hospital, and in increasing sales of other core business (not including drug-eluting stents) to Memorial Hermann.

59.     In the presence of Abbott Vascular sales rep David Clary, Conaway told customers -- including (1) Dr. James Wilson, an interventional cardiologist and director of the International Fellows Program, Texas Heart Institute/St. Luke's Episcopal Hospital, in Houston, Texas, and (2) Kristen Turner, vice president of cardiovascular services at that same hospital -- that Abbott Vascular has a lot of clinical trial work going on, and a lot of customers want to be involved.  Conaway told them that Abbott would be giving consideration to its "partners" first.

Conaway said that there was no guarantee that if they worked with Abbott they would get in a clinical trial, but if they were not working with Abbott, they would not be getting one.

60.     At the same time that it has been rewarding hospitals that purchase high volumes of Abbott products with the opportunity to participate in clinical trials or become commercialized sites for new products, Abbott Vascular has also been punishing hospitals who have not been good "partners" by disqualifying them from consideration for the trials or commercialized sites.  For example, Abbott Vascular was unsuccessful in an attempt to win business from Oklahoma Heart Hospital in Oklahoma City, Oklahoma.  Later on, after additional EXCEL trial slots had opened up, Cassidy decided not to let Oklahoma Heart Hospital be considered as an EXCEL trial site.  On March 11, 2011, after receiving an e-mail informing him that Oklahoma Heart Hospital was going to be invited to participate in the EXCEL study, Cassidy forwarded the e-mail to Williams and Jane Gaitley, saying: "Oklahoma Heart probably will not be added.....stay tuned."  Likewise, Cassidy and Conaway told Williams that Oschner Hospital in New Orleans, which recently decided not to purchase drug-eluting stents from Abbott (and, instead, entered into a sole-source contract with Boston Scientific), will probably not be considered as a commercial site for MitraClip—despite the fact that Oschner was an early clinical site for MitraClip.

### B.     Providing Funding to Customers in Exchange for Business.

61.     Abbott purportedly has a strict policy of requiring employees to justify, *without* regard to sales considerations, any requests to provide funding for educational programs.  However, Abbott provided approximately $300,000 of funding in connection with the 2010 New Cardiovascular Horizons conference hosted by Terrebonne General Hospital.  Previously, Abbott had not provided significant support for this conference, which is an annual event.  In late 2009,

however, using money remaining in its 2009 budget, Abbott decided to provide $300,000 of financial support, which consisted of a $200,000 grant through an entity called the Severitt Group, and another $100,000 of support for an interactive computer website.

62.     During that same timeframe, Abbott won a sole vendor contract under which it expects to sell between $1.0 and $1.5 million in coronary products to Terrebonne—an entity which had not been a significant purchaser of Abbott coronary products for the previous 10 years.  The key Abbott decision-maker behind this funding decision was Abbott Vascular's president, Chip Hance, working in conjunction with Dick Cassidy.  Hance apparently has a working relationship with Dr. Craig Walker, the most influential cardiologist at Terrebonne and the main force behind the conference.

63.     Also, in two meetings with South Hampton Community Hospital (in or near South Dallas, Texas) that took place in mid-September and October 2010, Conaway outlined various methods through which Abbott Vascular might help the hospital and a new group of physicians with marketing, in exchange for their business.  At both of these meetings, Conaway instructed the attendees *not* to take notes, put anything that was discussed in e-mails, or create any other written record of the discussions.

64.     The attendees at the mid-September meeting were, from the hospital:  Dr. John Jay, Dr. Craig Ferrara, Dr. Imad Alwan, Dr. Carl Horton, Dr. Mark Jenkins, Dr. Tu K. Le, Steve Takacs (COO), Marcus Pierre (CCO), Ed Downs (CEO), and Voncile Hilson Morrow (Cath Lab Dir.); and from Abbott Vascular:  Sam Conaway, Dick Cassidy, Pete Simmerson, Mike Aljoe , Chris Dobbs, Harry Farris and Williams.  During the meeting, using a dry-erase board for illustration, Conaway spoke about assisting the hospital with an advertising campaign and other ways of marketing, dinners for referring physicians, and doing community-based health screens.

22

Someone from the hospital asked how Abbott Vascular could get the funding for these activities, and Conaway responded, "Don't worry."  After the meeting, Williams, Farris, and Aljoe discussed the fact that what Conaway was doing was wrong, and that they felt uncomfortable being a part of the meeting.  Also, at some point Aljoe reported what happened at the meeting to Abbott Vascular's Office of Ethics and Compliance ("OEC"), but when OEC later followed up with him, Aljoe retracted his allegations.

C.   <u>Offering Free Product and Inducing Hospitals to Bill For It.</u>

65.   Williams witnessed several attempts by his supervisor Dick Cassidy to increase sales of Abbott Vascular products by offering free product to health care providers and inducing them to bill for the free product.

66.   In mid-November 2010, Cassidy prepared a spreadsheet comparing Abbott's prices to Boston Scientific's, taking into account the "prices" of items that Abbott would be providing for free (also known as "evaluation product").  As part of an e-mail dated November 14, 2010, Farris sent a copy of Cassidy's spreadsheet to Williams.  Williams understood that it was unlawful for health care providers to bill Medicare for free product; he also understood that it was improper for Abbott Vascular to provide free product to a provider and induce the provider to bill for it.  Accordingly, almost immediately after receiving the e-mail from Farris, in an attempt to stop Cassidy from engaging in conduct that would violate the False Claims Act, Williams sent Farris and Cassidy a response saying:  "Just a friendly reminder.  Please refer to Evaluation Product in units (up to 2 weeks worth of product), not in dollars."  The next day, November 15, 2010, Cassidy sent an e-mail to Williams and Farris saying:  "Very good point Stan.  We should not do revenue calculations for our customers on indigent or eval product."

67.     A few weeks later, on December 8, 2010, Williams attended a dinner with Cassidy, Abbott Vascular sales representative Tina Manek, and Dr. Robert Kipperman, a physician at Oklahoma Heart Hospital in Oklahoma City, Oklahoma.  The dinner took place at Mahogany Prime Steakhouse in Oklahoma City.  During the dinner, Cassidy discussed clinical "partnership" opportunities, including the EXCEL and BVS trials and the opportunity to be a commercial site for MitraClip.  Cassidy then pulled out and showed Dr. Kipperman the spreadsheet that Cassidy had prepared the previous month, *i.e.*, the one that compared prices between Abbott Vascular's products and those of Boston Scientific, taking into account the "price" of the free product.  The spreadsheet shows that in a straight-up comparison between the products offered by Abbott Vascular and Boston Scientific—with the two main products being drug-eluting stents and bare metal stents ("BMS")—Boston Scientific's prices were lower. Boston Scientific's price for a DES was $1425 per unit, vs. Abbott's price of $1450; and Boston Scientific's price for a BMS was $500 per unit, vs. Abbott's price of $550.   However, referring to the spreadsheet, Cassidy stated that Abbott Vascular could offer "evaluation product" worth approximately $247,000, and then when that free product was taken into account, the overall cost of Abbott Vascular's products would be less than the cost of Boston Scientific's products.

68.     Cassidy understood that the hospital could only benefit from the deal he was describing if the health care provider billed Medicare for the free product, which he knew was illegal.  At the meeting, Dr. Kipperman told Cassidy that it was not appropriate to bill for the product.  Nonetheless, and despite Williams' earlier attempt to stop him from engaging in unlawful conduct, Cassidy said to Kipperman:  "I'm not telling you what you can do or can't do. But *if* you bill for this, it will net down to [X]."

69.     Dr. Kipperman and Oklahoma Heart Hospital decided not to purchase devices from Abbott Vascular.  In response, Cassidy made sure that Oklahoma Heart Hospital was taken out of consideration as a potential site for the EXCEL clinical trial.

70.     Earlier on the same day as the meeting in Oklahoma City (December 8, 2010), Williams saw Cassidy offer to provide free product in a meeting at Baylor Heart Hospital in Plano, Texas.  The representatives of Baylor Heart Hospital rejected the offer, saying that they did not use free product.

71.     In January 2011, Scott Bartles, Abbott Vascular's director of finance, mentioned to Williams that he had been called by Cassidy with a request to ship 200 Xience stents to a customer but only bill for 100 of the stents.  Bartles thought the request was unusual.  Bartles asked Williams why he thought Cassidy would have made the request.  Williams told Bartles that he thought Cassidy had made the request because Cassidy wanted to give the customer documentation indicating that it had paid for all of the units, and therefore, could go ahead and bill them to Medicare, Medicaid, or private insurance.  In other words, Cassidy was attempting to induce the hospital to take advantage of the free product and bill for it, which is unlawful. Bartles told Williams he would not approve the request.

72.     Williams has been told that when Xience was launched in July 2008, Jay Sullivan, Abbott Vascular's divisional vice president for national accounts, instructed his entire corporate and national accounts team to use free Xience product in any way necessary to increase sales of that product.  Williams was also told that Abbott Vascular would use its indigent care program -- under which Abbott would provide replacement product to hospitals that provided devices to indigent patients -- as a means for increasing sales.

25

D.      Sharing Pricing Strategies with Boston Scientific for Drug-Eluting Stents.

73.     Jay Sullivan, a divisional vice president responsible for Abbott Vascular's national accounts, has admitted on several occasions that he has "sources" at Boston Scientific— Abbott Vascular's chief competitor in the DES market—who share pricing strategies with him. In or about March 2011, during a meeting of Abbott Vascular's sales directors and vice presidents, Sullivan commented that his sources at Boston Scientific were sharing information with him about that company's pricing strategies, including what accounts Boston Scientific was going to pursue and at what price.  Also, one of Williams' former Abbott Vascular co-employees, Steve Dreaden, told Williams that Dreaden had heard Sullivan make similar admissions on a number of occasions.  Dreaden also told Williams that sometime in 2010, during contract negotiations with Kaiser in California, Dick Cassidy had a conversation with his counterpart from Boston Scientific about pricing strategies.

**IMPACT OF INDUCEMENTS ON SALES OF ABBOTT VASCULAR PRODUCTS**

74.     There has been a significant increase in recent purchases of Abbott Vascular products by several hospitals to which Abbott Vascular was offering inducements such as the opportunity to be considered for participation in clinical trials, or sponsorship grants for conferences.  For example, from the second to the third quarter of 2010, Abbott Vascular's revenues from sales to Terrebonne General Medical Center more than quadrupled, growing from $68,544 to $309,717.  Terrebonne purchased over $1 million in Abbott Vascular product from Q3 2010 to Q2 2011 (inclusive).  By contrast, Terrebonne purchased only about $300,000 of Abbott Vascular product in 2009.  Similar increases occurred with Banner Health System in

Arizona, where Dick Cassidy and another Abbott Vascular salesperson, Candace Imwalle, held discussions with hospital employees about the need to be good "partners" with Abbott.

## ABBOTT CAUSED PROVIDERS TO FILE FALSE CLAIMS

75.     Through its conduct in violation of the Anti-Kickback Statute, as well as its other misconduct described herein, Abbott Vascular has knowingly caused numerous hospitals to file false claims in the form of CMS Forms 1450 for cardiac surgeries, and also, false claims and false statements material to false claims in the form of annual cost reports submitted under Part A of the Medicare Program.  In addition, Abbott Vascular has knowingly caused numerous physicians to file false claims for reimbursement for professional services rendered under Part B of the Medicare Program in the form of CMS Forms 1500.  These hospital and physician claims are all "false claims" within the meaning of the False Claims Act, either because they include "items or services resulting from a violation of" the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b (g), or because the claims violated other federal health care laws material to the Government's decision to pay the claims.

76.     For a representative example, Terrebonne General Medical Center of Houma, Louisiana, with Medicare provider number 190008, has filed with its Medicare fiscal intermediary an annual Medicare cost report covering items and services provided during the fiscal year ending March 31, 2011.  The cost report submitted by Terrebonne General Medical Center was a false claim, as well as a false statement material to a false claim, because it included "items or services resulting from a violation of" the Anti-Kickback Statute.  42 U.S.C. § 1320a-7b (g).

77.     For another representative example, Baylor Heart and Vascular Hospital of Dallas, Texas, with Medicare provider number 450851, has filed with its Medicare fiscal

intermediary an annual Medicare cost report covering items and services provided during the fiscal year ending June 30, 2010. The cost report submitted by Baylor Heart and Vascular Hospital was a false claim, as well as a false statement material to a false claim, because it included "items or services resulting from a violation of" the Anti-Kickback Statute. 42 U.S.C. § 1320a-7b (g).

## ABBOTT'S TERMINATION OF WILLIAMS' EMPLOYMENT

78.     On September 7, 2010, concerned about the ethics and unlawful conduct of Cassidy, Conaway, and others, Williams spoke on the telephone with Jean Munson of Abbott Vascular's Human Resources department. Williams told Munson that he had ethical concerns about his division and asked whether he could be guaranteed that, if he reported their improper activities, he would be protected from retaliation. Munson told Williams she could *not* guarantee that he would not be subjected to retaliation.

79.     Throughout the next several months, it became increasingly clear to Williams that Cassidy and Conaway were engaging in a variety of unlawful activities that could lead to the submission of false claims to Medicare. Williams grew increasingly uncomfortable and, on at least one occasion, openly expressed his discomfort to his colleagues. After the mid-September 2010 meeting at South Hampton Community Hospital, where Cassidy had outlined various ways that Abbott Vascular could help a group of physicians with their marketing in exchange for their business, Williams openly stated to two of his colleagues, Mike Aljoe and Harry Farris, that what Cassidy was doing was wrong.

80.     As described above, on November 14, 2010, Williams sent an e-mail to his supervisor, Dick Cassidy, trying to stop him from engaging in actions that could violate the False

28

Claims Act: namely, pointing out that it was improper to induce a provider to bill for evaluation product provided by Abbott.

81.     In December 2010, Williams had a meeting with Lance Scott, a division vice president for Abbott Vascular, at the New Orleans airport. During that meeting, Williams told Scott that he was concerned about the way Conaway and Cassidy were getting business.

82.     On or about February 14-15, 2011, in meetings covering two days at the W Hotel in Phoenix, Arizona, several regional sales managers who reported to Williams, in Williams' presence, each presented their business plans to Dick Cassidy and Sam Conaway. These managers included Harry Farris, Dave Wietecha, Bryan Blau, Candice Imwalle, and Monique Caruth.

83.     Dave Wietecha was responsible for sales in the Gulf Coast coronary region covering south Texas and southwest Louisana. From an Abbott Vascular sales perspective, this region is the poorest performing region for sales in the country. Leading up to the February 2011 meeting, in a late-January "pre-meeting" at the airport Marriott in Minneapolis, Minnesota, Cassidy had asked Wietecha and Williams to tell him what specific resources would be needed, including clinical trials, to turn around the sales performance in the Gulf Coast region.

84.     At the mid-February meeting, Wietecha gave a power point presentation in which he had written that there were approximately six to ten accounts in the Gulf Coast region where, in order to "flip the business" to Abbott, he needed to get the hospitals into Abbott clinical trials. By "flip the business," Wietecha meant increasing Abbott Vascular's sales of DES and other coronary-angioplasty products. During the power point presentation, in Williams' presence, Conaway stopped Wietecha. Conaway said that he understood what Wietecha needed, but he told Wietecha that he should not be putting it in writing and, therefore, needed to change the

written presentation.  The overall discussion focused on the particular hospitals and physicians that Wietecha was referring to, as well as their specific interests in clinical trials.

85.     After Williams' subordinates made their presentations, Williams presented his own business plan to Cassidy, Conaway, and Jay Sullivan, the Vice President of National Accounts for Abbott Vascular.  Williams' power point presentation did *not* refer to placing clinical trials with the customers.  In the presence of Cassidy and Sullivan, Conaway criticized Williams' plan because it "wasn't outside the box" and "wasn't creative enough.  Conaway specifically asked Williams:  Where could Abbott put clinical trials to increase business?  Conaway told Williams not to "worry about the legalities" of that.  Conaway said that Abbott would work through or around that point.  He pointedly asked Williams: Assuming we don't have to worry about the legalities, where would you put trial sites to flip the business?

86.     Williams never presented the kind of plan that his superiors were demanding of him, *i.e.*, a plan that showed where he would put trial sites in order to increase sales of Abbott products.

87.     On March 23, 2011, at the conclusion of a lunch meeting with a doctor in Houston, Texas, Cassidy informed Williams that his employment with Abbott was going to be terminated.  Cassidy said that he had met with Sam Conaway, Human Resources, Chip Hance (Abbott Vascular's president), and other "senior leaders," and that they had all agreed that moving forward, there would be no job for Williams at Abbott Vascular.  Cassidy said that his decision was final.  He informed Williams that he would be receiving a "transition letter and package" from Human Resources within the next five business days, and that after he received the letter, he would have 21 days to sign the letter, accepting all of its terms.  He told Williams that his last day of work at Abbott would be April 15th.

88.     In early April 2011, Tom Potts and Ken Brooksbank, both territory managers, called Williams.  They told Williams that they had heard from another territory manager, Tom Fenton, that Fenton had heard that Williams was "done at Abbott Vascular" and that April would be his last month as an Abbott employee.

89.     Williams received a "transition letter" letter from Abbott.  Williams refused to agree to the terms set forth in the letter, and he did not resign his position.  In late April 2011, Abbott remotely disabled Williams' laptop computer so that he could no longer log on or access documents through it.  Abbott terminated Williams' employment effective May 2, 2011.

### COUNT I:  Knowingly Causing False Claims to be Presented
### (31 U.S.C. § 3729(a)(1)(A))

90.     Plaintiff re-alleges and incorporates the allegations contained in paragraphs 1 through 89 as if fully set forth herein.  This Count is a civil action against Defendant Abbott Laboratories for violating 31 U.S.C. § 3729(a)(1)(A).

91.     By engaging in the conduct set forth herein, Defendant has knowingly caused to be presented false or fraudulent claims for payment or approval, within the meaning of § 3729.

92.     Because of the Defendant's conduct under this Count, the United States has suffered substantial actual damages.

### COUNT II:  False Statements or Records
### (31 U.S.C. § 3729(a)(1)(B))

93.     Plaintiff re-alleges and incorporates the allegations contained in paragraphs 1 through 89 as if fully set forth herein.  This Count is a civil action against Defendant Abbott Laboratories for violating 31 U.S.C. § 3729(a)(1)(B).

94.     By engaging in the conduct set forth herein, Defendant has knowingly caused to be made or used, false records or statements material to false or fraudulent claims, within the meaning of § 3729.

95.     Because of the Defendant's conduct under this Count, the United States has suffered substantial actual damages.

## COUNT III:  Conspiracy to Violate False Claims Act
### (31 U.S.C. § 3729(a)(1)(C))

96.     Plaintiff re-alleges and incorporates the allegations contained in paragraphs 1 through 89, as if fully set forth herein.  This Count is a civil action against Defendant Abbott Laboratories for violating 31 U.S.C. § 3729(a)(1)(C).

97.     Defendant has conspired with others to commit violations of §§ 3729(A) and 3729(B).

98.     Because of the Defendant's conduct under this Count, the United States has suffered substantial actual damages.

## COUNT IV:  False Claims Act Anti-Retaliation Provision
### (31 U.S.C. § 3730(h))

99.     Plaintiff re-alleges and incorporates the allegations contained in paragraphs 1 through 89 as if fully set forth herein.  This Count is a civil action against Defendant Abbott Laboratories for violating the anti-retaliation provision of the False Claims Act, 31 U.S.C. § 3730(h).

100.     During the course of his employment, Plaintiff attempted to stop Defendant's violations of the False Claims Act.  Defendant was aware of Plaintiff's efforts to stop violations of the False Claims Act.

101.    Because Plaintiff was engaged in activities that are protected under the False Claim Act's anti-retaliation provision, 31 U.S.C. § 3730(h), Defendant retaliated against Plaintiff, discriminating against him in the terms of his employment and, ultimately, terminating his employment with Defendant.

102.    As a direct and proximate result of the foregoing, Plaintiff has lost the benefit and privileges of employment, including salary, commissions, bonuses, stock options, and pension benefits, and he has suffered other economic and non-economic damages, including irreparable, continuing harm to his reputation and career.  Plaintiff is entitled to all relief necessary to make him whole.

## PRAYER FOR RELIEF

Plaintiff demands judgment against Defendant as follows:

a. That by reason of the violations of the False Claims Act, this Court enter judgment in favor of the United States and against Defendant in an amount equal to three times the amount of damages the United States Government has sustained because of Defendant's actions, plus a civil penalty of not less than Five Thousand Five Hundred Dollars ($5,500.00) and not more than Eleven Thousand Dollars ($11,000.00) for each violation of 31 U.S.C. § 3729;

b. That the Relator, as *qui tam* Plaintiff, be awarded the maximum amount allowed pursuant to Section 3730(d) of the False Claims Act or any other applicable provision of law;

c.  That, by reason of Defendant's violation of the whistleblower protection provision of the False Claims Act, 31 U.S.C. § 3730(h), judgment be entered in favor of Plaintiff and against Defendant;

d. That Plaintiff be awarded double his back-pay losses under the whistleblower protection provision of the False Claims Act, 31 U.S.C. § 3730(h), plus front pay and special damages, and all other monetary relief necessary to make him whole;

e.  That Plaintiff be re-instated to his former position, with all applicable raises;

f. That Plaintiff be awarded all costs of this action, including reasonable attorney's fees, reasonable out-of-pocket costs, and court costs; and

g. That Plaintiff have such other relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands that this matter be tried before a jury.

Robert L. Vogel
Maryland Federal Bar No. 07960
VOGEL, SLADE & GOLDSTEIN, LLP
1718 Connecticut Ave., N.W., 7th Floor
Washington, D.C. 20009
Tel. 202-537-5904/ Fax 202-537-5905
E-mail: rvogel@vsg-law.com

Catherine D. Bertram
Maryland Federal Bar No. 07115
Regan Zambri & Long, PLLC
1919 M Street, N.W., Suite 350
Washington, D.C. 20036
Tel. 202-463-3030/Fax 202-463-0667
cbertram@reganfirm.com

Attorneys for Relator

Dated:  June 23, 2011